**Katherine Holt BARKER et al., Appellants,**

**v.**

**Adrian F. LEVY et al., Appellees.**

**No. 916.**

Court of Civil Appeals of Texas, Houston (14th Dist.).

March 20, 1974.

Rehearing Denied April 10, 1974.

George F. Christie, Alex Pope, Jr., Robert Hobbs, Pope, Hardwicke, Hobbs, Chris-

tie & Montgomery, Fort Worth, Guy C. Jackson, III, Jackson & Jackson, Anahuac, for appellants.

Preston Shirley, Mills, Shirley, Mc-Micken & Eckel, Galveston, Eugene T. Jenson, Anahuac, for appellees.

TUNKS, Chief Justice.

In the early 1900's some members of a family named Cade owned several thousand acres of land lying in Galveston, Chambers, and Jefferson Counties in Texas. This property will be referred to as the Cade lands. Around 1924 the ownership of that land became the subject of litigation. The litigation, reported as Cade v. Holt, 32 F.2d 257 (S.D.Tex.1927), aff'd per curiam, 32 F.2d 260 (5th Cir.), cert. denied, 280 U.S. 565, 50 S.Ct. 25, 74 L.Ed. 619 (1929), resulted in a judgment that Margaret Cade Sweet and her sister, Katherine Cade Holt, each owned an undivided 3/10 interest in the Cade lands. In that litigation the two named sisters were represented by a Galveston lawyer, Adrian F. Levy, hereafter referred to as Levy.

After the lawsuit was over Levy continued to represent Mrs. Sweet with reference to matters concerning her ownership in the Cade lands. In early 1930 Mrs. Sweet was in the process of getting a divorce in New York where she lived. Levy prepared instruments relating to Mrs. Sweet's ownership in the Cade lands to be used in that divorce proceeding. On May 1, 1930, Levy wrote to Mrs. Sweet suggesting that she put the title to her interest in the Cade lands into a Texas corporation of which she would own all of the shares. It was suggested that Levy be made an officer of that corporation with authority to execute instruments relating to the use and disposition of the Cade lands. This would facilitate his handling of her interest in the Cade lands while she was traveling abroad, which she apparently expressed to be her intention.

Before the May 1, 1930, letter Mrs. Sweet had paid Levy cash fees for his representation of her interests. In that letter he pointed out that the Cade lands had a potential for oil production. Levy proposed that he be given an interest in the minerals of the lands as a fee for his future representation of her interest. That proposal was in the following language:

For my services, professional as well as personal, in organizing the corporation and in handling all of your affairs, including the defense and/or prosecution of any law suits that may be filed against you, I would only ask for a nominal interest in the minerals of, say, 1/160th. In other words, you would give me no interest in the real estate. On this basis, I would be entitled to receive 1/160th of any amounts of oil that might be produced and sold on your lands in Galveston County. If the field develops and becoms [sic] a great success, I will, of course, be liberally compensated. If, on the other hand, it gets no bigger than it is now, my compensation would be nominal considering the services rendered and to be rendered. It occurs to me that this arrangement would be entirely fair to you and is acceptable as far as I am concerned. Of course, if this basis is not satisfactory to you, we can work out some other mutually satisfactory plan. However, I would prefer having an interest in the minerals rather than a cash fee for each service as and when rendered.

Mrs. Sweet approved the arrangement proposed by Levy. He thereupon prepared a deed dated July 21, 1930, from Mrs. Sweet to him, a charter for a Texas corporation named Long Island Petroleum Company, and a deed from Mrs. Sweet to that corporation. On or about July 21, 1930, those instruments were mailed to Mrs. Sweet in New York so that she could, as she had requested, have them examined by her New York counsel. On August 5, 1930, Levy met with Mrs. Sweet at the Corn Exchange Bank & Trust Co. of New York, which bank handled a trust for Mrs. Sweet. A trust officer of the bank who

was a lawyer attended the meeting. The instruments were discussed and were approved by the New York lawyer. Mrs. Sweet then signed, first the deed to Levy, then the other two instruments. Later, all of them were duly filed in Texas.

The deed, sometimes hereinafter called the Sweet deed, from Mrs. Sweet to Levy, which deed is the principal subject of this case, was in the following language:

THE STATE OF TEXAS }
COUNTY OF GALVESTON }

For and in consideration of One Dollar ($1.00) cash to me in hand paid by Adrian F. Levy of Galveston County, Texas, and other good and valuable considerations, the receipt of which is hereby acknowledged and confessed, I, Margaret Cade Sweet, a feme sole, of Queens County, State of New York, have granted, sold, conveyed, transferred and assigned, and by these presents do bargain, grant, sell, convey, transfer and assign unto the said Adrian F. Levy a One/one hundred and sixtieth (1/160th) part of all oil, gas, petroleum, sulphur and all other minerals that may be produced and saved from the following described lands, to wit:

[DESCRIPTION OF PROPERTY OMITTED]

TO HAVE AND TO HOLD the same unto the said Adrian F. Levy, his heirs, administrators, administrators [sic] and assigns forever.

I do hereby bind myself, my heirs, executors, and administrators to warrant and forever defend, all and singular, the interest hereby conveyed unto the said Adrian F. Levy, his heirs, assigns and legal representatives, against the lawful claim of every person lawfully claiming or to claim the same or any part thereof.

It is intended by this instrument to convey unto the said Adrian F. Levy a 1/160th part of all the oil, gas, sulphur and other minerals that may be produced and saved from all lands in the State of Texas, the title to which is now owned in whole or in part by me, as well as such lands in the State of Texas which I have heretofore sold but in which I have retained an interest in the minerals.

Executed this the 21st day of July, A. D. 1930.

/s/ Margaret Cade Sweet

In 1933 Mrs. Sweet died intestate. Mrs. Katherine Cade Holt, her only heir, inherited her shares of stock in Long Island Petroleum Company. In 1947 that corporation was dissolved, and its ownership of Mrs. Sweet's former interest in the Cade lands was conveyed to Katherine Holt Barker and Melanie Holt Speer, Mrs. Holt's daughters and only children. In 1951 Mrs. Barker conveyed a part of her interest to The First National Bank of Fort Worth as trustee for her children. In 1970 Mrs. Holt died. On January 15, 1971, Mrs. Barker, Mrs. Speer, and the trustee bank filed this suit. Adrian F. Levy and his two children, to whom he had transferred a part of his interest, were named as defendants. The case was tried to a jury. After the evidence was closed the trial judge withdrew the case from the jury and rendered judgment for the defendants. The plaintiffs appealed.

The plaintiffs in the trial court, appellants here, contend that the above quoted deed is unambiguous and conveyed to Levy a 1/160 of the minerals in place. The defendants in the trial court, appellees here, contend that the deed is unambiguous and conveyed to Levy a royalty of 1/160 of the oil produced from the lands described. Some of the Cade lands were, at the time of the deed, subject to an oil and gas lease to one Marrs McLean under which the lessors were entitled to 1/8 royalty. In accordance with the contention of the plaintiffs-appellants Levy was, under that lease, entitled to 1/160 or 1/8, or 1/1280, of the oil produced, free and clear of the cost of production. According to the contention of the defend-

ants-appellees, they were entitled to 1/160 of all of the oil produced, free and clear of the cost of production. Alternatively, each side contends that if the deed is ambiguous it should, under the extrinsic evidence, be construed in that side's favor. In their prayer the plaintiffs ask judgment construing the deed, in accordance with their contention, as a conveyance of 1/160 of the minerals in place and not a conveyance of a 1/160 royalty, or, in the alternative, that it be reformed so as to convey such interest. They also seek a money judgment, with 10% interest, for the amount of the payments which the defendants have received out of the production from the Cade lands to the extent that those payments exceed what they should have received as owners of 1/160 of the minerals in place. The plaintiffs do not allege that the Sweet deed was unfair nor seek its cancellation on that ground.

The defendants' answer includes affirmative defenses of limitations, laches, estoppel, waiver, and ratification. They also plead that certain leases and division orders signed by plaintiffs and/or their predecessors and by Levy recite that Levy is to receive a 1/160 royalty and are contractually binding.

Appellants contend that the Sweet deed is unambiguous and conveys to Levy 1/160 of the minerals in place. They state that the question is one of first impression as to any Supreme Court of Texas holding. They forthrightly admit that the language of two Texas courts of civil appeals' opinions, hereafter discussed, is contrary to their contention. They cite, as authority for their contention, three out-of-state judicial opinions and two texts.

The first case cited by appellants is Little v. Mountain View Dairies, 35 Cal.2d 232, 217 P.2d 416 (1950). In that case the deed in question conveyed "Eight and one-third per cent (8⅓%) of all oil, gas and other hydrocarbon substances, and minerals, in, under and/or which may be hereafter produced and save [sic] from" the

property. The Court held that the deed conveyed a 1/12 interest in the minerals in place. The Court said, at page 419:

It is clear, therefore, that in California as in other jurisdictions, in the absence of extrinsic evidence or other controlling language in the deed, a grant of a fraction of all the oil in, under and that may be produced and saved from the land creates an expense-bearing mineral fee interest.

One of the texts cited by appellants is Maxwell, A Primer of Mineral and Royalty Conveyancing, 3 U.C.L.A.L.Rev. 449 (1956). That article includes a discussion of the Mountain View Dairies case, *supra*. Appellants quoted the following language from page 457:

There is ample basis in authority and practice in many jurisdictions, regardless of theories of ownership, to sustain the court's conclusion that more than the addition of the conveyancing formality "and which may be produced" is necessary for the creation of a royalty interest.

Other language from that same article at pages 456–458 is much more significant. The writer there said:

One contention which the court considered in the *Mountain View Dairies* case was to the effect that the addition of the words, "and which may hereafter be produced and saved" to the grant of "eight and one-third percent of all oil, gas and other hydrocarbons," was indicative of an intent to grant an expense-free royalty interest. One reason for the rejection of this contention was the fact that California does not consider that oil and gas is owned "in place." The court opined that in view of the existence in California of the so-called non-ownership theory "the parties might well doubt the effectiveness of a conveyance limited to a fraction of all the oil and gas in and under the land and therefore add a reference to oil to be produced, without in any way intending to

convey more than the stated fraction of all the oil rights appurtenant to the land." It is, however, common practice to add the phrase "and which may be produced" to a document which purports to convey a specified portion of the oil and gas "in and under" the land without any other basis in the language for finding that the interest created is not an expense-bearing mineral interest. [Omitted material cited above] A less stereotyped spelling out of the expense-free characteristic of royalty will, however, often be sufficient ground for a determination that a royalty interest has been created. A recent example is Fry v. Smith, where a grant of "one-sixteenth (1/16) of all the oil and gas beneath the surface of the ground" modified by a clause stating "and which oil and gas may be produced . . . and the oil and gas delivered to his credit in the pipe line connected by him to the wells, free of cost," was construed as creating a one-sixteenth royalty interest.

The omission of the standard words of mineral ownership, "in and under," in a conveyance which speaks of oil and gas "produced," creates a context in which the latter language assumes greater significance. The reservation construed in Miller v. Speed is illustrative: "an undivided 1/24 of all the oil, gas and other minerals produced, saved and made available for market." The court noted that "A 1/24 of all the oil in and under and that may be produced from a tract of land is an interest in the minerals in place in the ground, but that is a different interest than a 1/24 of all the oil that may be produced, saved and made available for market . . . ." The opinion in the Miller case makes it clear that the absence of the words "in and under" was a critical factor in their interpretation of the reservation as a royalty reservation. In this the opinion is typical. That these words most often flag a mineral interest is supported by cases from many jurisdictions. That they have become a kind of shorthand for a statement that the interest described bears the expense of production and is therefore to be classified as a mineral interest is apparent from the judicial handling of them when they are used in the same conveyance with words such as "which may be produced" which tends toward an expense-free royalty interest. [Footnotes omitted]

That explanation of the holding in Mountain View Dairies renders it unpersuasive as to the appellants' claim relating to construction of the Sweet deed, which did not use the words "in and under."

The next case cited by appellants is Simson v. Langholf, 133 Colo. 208, 293 P.2d 302 (1956). In that case the Court held that the grant of "forty-nine percent (49%) of all oil and/or gas that may be produced saved and marketed" granted a 49% interest in the minerals in place. In that case the successors to the grantee were contending that the instrument conveyed a 49% interest in the minerals in place—they claimed a right to participate in bonus and delay rental payments. The Court's opinion recited that there was no oil and gas lease covering the property in effect at the time the deed was executed and indicated that if there had been such a lease the Court would have held differently. At page 307 the Court said:

[T]here being no oil or gas lease in existence at the time of the conveyance or reservation, the words of the grant or reservation "assigned and set over" are such as to convey a partial interest in the minerals in perpetuity, and an estate in fee simple is thus created.

At the time the Sweet deed was executed the Marrs McLean lease was in effect and still is. That fact distinguishes the Simson case. Furthermore, there is no requirement in Texas law that a lease be in effect before a royalty interest can be created.

The third out-of-state case cited by appellants is Mounger v. Pittman, 235 Miss. 85, 108 So.2d 565 (1959). In that case the Court, in a five to three opinion, held that a reservation of "one-eighth of all the oil and gas which may be produced from said lands to be delivered in tanks and pipelines in the customary manner, and this shall be a covenant running with the land and all sales and other conveyances of said lands shall be subject to this reservation and agreement" reserved a ⅛ mineral interest instead of a ⅛ royalty interest in all oil and gas produced.

In that case, too, the land was not under lease at the time the reservation was made. In a later case Gardner v. Pan-American Petroleum Corporation, 243 So.2d 399 (Miss.Sup.1971), the same Court apparently considered that to be a distinguishing fact. In the Gardner case the Court held that a provision in a will devising to each of three persons ⅓ interest "in all Gas and Oil and other Minerals and Royalties that is or May be Proudeosed [sic]" created royalty interests in the devisees. The land involved was under lease at the time the will became effective. The Court distinguished the Mounger case saying, at page 402, "The land [in the Mounger case] was not under lease and there was no production." For the same reason the Mounger case is distinguished here because some of the Cade land was under lease at the time the Sweet deed was executed.

The other text authority cited by appellants is Emery, Conveyancing of Interests in Oil and Gas, 29 Okl.B.J. 1965 (1958). There the author says good draftsmanship requires that where a conveyance of a royalty is intended, "There should be added the proviso that 'it is the intention of the parties hereto to convey a royalty interest as distinguished from a mineral interest.' " It is quite probable that these appellees now heartily agree with this advice. However, it was written twenty-eight years too late to have been helpful to Mr. Levy and Mrs. Sweet. It is not authority for the proposition that the Sweet deed created a mineral interest.

The Texas case authority cited by appellants is Jones v. Bedford, 56 S.W.2d 305 (Tex.Civ.App.—Eastland 1932, writ ref'd). That case involved the construction of some complicated language (held by the court to be unambiguous) in a conveyance. The language of that conveyance bears no significant similarity to the language of the Sweet deed, and, accordingly that case is of no assistance here. The question there was whether the grantees were entitled to ⅛ or ⅟₆₄ of the ⅛ royalty under the lease in effect at the time of the conveyance. The granting clause recited the conveyance of an "undivided ⅛ of ⅛ royalty interest in and to all of the oil, gas and other minerals in and under and that may be produced from the following described land." The majority opinion says, at page 308:

> It being clear from the instrument that the interest or estate granted included more than the particular royalty interest payable under the terms of the leases, it becomes unimportant just what was meant by the use of the word "royalty," since whatever it was, other portions of the instrument show clearly that the conveyance was of a ⅛ of ⅛, or ⅟₆₄, interest in and to all the oil, gas, and other minerals, subject to the leases, but carrying with it the same reversionary interest after the leases ceased to be enforced.

Those are the principal authorities as to the construction of the Sweet deed presented by counsel for appellants. They are neither compelling nor very persuasive of the proposition that the Sweet deed was a conveyance of minerals in place. On the other hand, counsel for appellees have cited two Texas cases that are directly in point and sustain the conclusion that the Sweet deed conveyed a ⅟₁₆₀ royalty. They are Miller v. Speed, 248 S.W.2d 250 (Tex. Civ.App.—Eastland 1952, no writ), and Pinchback v. Gulf Oil Corp., 242 S.W.2d

242 (Tex.Civ.App.—Beaumont 1951, writ ref'd n. r. e.).

The Miller case was discussed in the above quoted portion of the law review article of Professor Maxwell. It held that a deed reserving "an undivided ½₄th of all the oil, gas and other minerals produced, saved and made available for market" reserved a ½₄ royalty interest. In so holding the Court noted that the reservation clause used the word "all" and the words "produced, saved." The Court also noted the absence of the words "in and under." The Sweet deed has all three of those characteristics.

In the Pinchback case the deed in question reserved "⅛th of all minerals that may hereafter be produced and saved." The Court held that the grantor reserved a ⅛ royalty.

■ We, therefore, hold that the Sweet deed is unambiguous and that it conveyed to Levy a ¹⁄₁₆₀ royalty. Since the deed is clear and unambiguous the extrinsic evidence is immaterial on the issue of the intention of the parties in its execution. This holding disposes of the plaintiffs' claim for a money judgment against the defendants on the theory that they received payments from production from the Cade lands in excess of that to which they were entitled under the Sweet deed.

There remains the questions presented by the plaintiffs' alternative plea for reformation of the Sweet deed. They seek such reformation upon the allegations that Levy misled Mrs. Sweet into believing that the Sweet deed conveyed a ¹⁄₁₆₀ mineral interest, that he was her lawyer at the time, and that such misleading constituted a breach of his fiduciary duty to her and was "at least constructively fraudulent."

Plaintiffs' suit for reformation is governed by the four-year statute of limitations, which the defendants pleaded. Miles v. Martin, 159 Tex. 336, 321 S.W.2d 62 (1959). Appellants contend that, in determining the point of time at which the limi-

tation period began to run, we should, because of an existing attorney-client relationship between Levy on the one hand and Mrs. Sweet and her successors on the other hand, apply the rule pronounced in Courseview, Incorporated v. Phillips Petroleum Co., 158 Tex. 397, 312 S.W.2d 197 (1957). In the context of this appeal, we agree with that contention. We also agree with appellants that there was extrinsic evidence on which the jury could have based a finding that Mrs. Sweet, at the time she executed the deed in question, intended to convey to Levy a smaller interest than that described in the deed. The evidence was such that it raised questions of fact on the basis of which it could have been concluded that Levy's conduct with reference to the execution of the deed was "at least constructively fraudulent," as alleged by plaintiffs. The trial court's peremptory judgment, insofar as it relates to suit for reformation, can be sustained only if the evidence shows as a matter of law, that suit for reformation was barred by limitation.

■ The limitation period began to run when the plaintiffs discovered, or, in the exercise of reasonable diligence, should have discovered, the facts upon which their cause of action is based. The Courseview case, *supra,* does not change that general rule—it prescribes a special application of it in a situation where the transaction is between parties standing in a fiduciary relationship. The Court said:

The fiduciary relationship is therefore one of the circumstances to be considered in determining whether fraud might have been discovered by the exercise of reasonable diligence. It may excuse the defrauded party from taking action that would be required in an arm's-length transaction or from making as prompt or searching investigation as might otherwise be expected. In some situations there is no legal duty to use means available for discovering the fraud, and this is such a case. We are not prepared to say, however, that one in a relationship

of trust and confidence is always justified as a matter of law in neglecting every precaution until something occurs to arouse his suspicions.

Courseview, Incorporated v. Phillips Petroleum Co., *supra* at 205.

Therefore, we have examined the evidence in order to determine whether it, when viewed in the light most favorable to the plaintiffs, shows as a matter of law that the plaintiffs, or those from whom they claim, knew or, in the exercise of that degree of diligence which a client should exercise in reference to a transaction with his attorney, should have known for a period of more than four years before this suit was filed on January 15, 1971, that Mrs. Sweet had conveyed to Levy a ⅟₁₆₀ royalty, instead of a ⅟₁₆₀ interest in the minerals under the Cade property, which latter we are assuming she intended to convey. We hold that the evidence shows those facts as a matter of law and that plaintiffs' suit for reformation of the Sweet deed is barred by limitation.

There is in evidence the last three pages of a letter from Levy to Mrs. Sweet. This letter was produced from the files of the plaintiffs. Since the first two pages were missing, its exact date is unknown. However, its contents show its date to be sometime between the date of the execution of the Sweet deed and April 21, 1931. The contents of the letter also show that it was sent in response to either an inquiry or a protest from Mrs. Sweet to Levy relating to the "great amount" of the payments Levy had been receiving under the Sweet deed out of the oil production from the Cade lands. In that letter Levy clearly explained to Mrs. Sweet, in the language of laymen, the amount of the payments he was claiming under the deed and the relationship of those payments to those being received by her from her ownership. Some of it is quoted:

> And now for a word with you about your agreement with me. . . . It may be true that on a particular tract

the ⅟₁₆₀th interest which you conveyed to me might be equal to a ¼th of your income from that particular tract. On the other hand, this would not apply to the greater part of the acreage where you own a much larger interest than you do on that under development by McLean. The reason that you do not own more interest in the acreage now being developed by McLean is because you sold a part of your royalty to him in addition to the interest conveyed under the lease.

. . .

> I notice where you compare the nature and value of my services to those of a corporation serving hundreds and maybe thousands of cases. In view of the fact that I am not only acting for the corporation and for you in a business capacity but also as an attorney rendering professional services, for which you would be charged extra by any bank or trust company, it seems hardly fair to make the comparison.

Some of Mrs. Sweet's property was managed by a bank trust department. The last quoted excerpt from the letter indicates that Mrs. Sweet had protested that the payments to Levy were high as compared with payments she made to the bank for handling her other property.

This letter conclusively shows that during her lifetime Mrs. Sweet had notice of the amounts to which Levy was claiming he was entitled under the Sweet deed and the ratio of his payments to hers. If those amounts were greater than those that she intended him to receive under the deed, the limitation period applicable to a suit to reform the deed began to run at that time.

■ Mrs. Sweet's equitable right to have the deed reformed was personal to her and was not a covenant running with the land. Halbert v. Green, 156 Tex. 223, 293 S.W.2d 848 (1956). There is nothing in evidence showing an assignment of that right to these plaintiffs or their predecessors in title to the land. If the right sur-

vived Mrs. Sweet's death in 1933 and passed to these plaintiffs, it did so by Mrs. Holt's inheritance from Mrs. Sweet and by Mrs. Holt's will to the plaintiffs. Mrs. Speer's children were also beneficiaries of Mrs. Holt's will, but since they own no interest in the land which was derived from Mrs. Sweet, their rights would not be affected by the reformation of the Sweet deed, and they are not indispensable parties to this suit. Mrs. Sweet's death did not toll for more than one year the running of the statute of limitations which had begun during her lifetime. Berry v. Humble Oil & Refining Co., 205 S.W.2d 376 (Tex.Civ. App.—Waco 1947, writ ref'd n.r.e.); Vernon's Tex.Rev.Civ.Stat.Ann. art. 5538 (1958).

There are many documents in evidence that show a confirmation, by the other owners of the Sweet interest in the Cade lands, of Levy's ownership of a 1/160 royalty in the Cade lands. Mrs. Sweet, Mrs. Holt, in her capacity as president of Long Island Petroleum, and these plaintiffs have, over the forty-year period, joined with Levy and others in executing division orders, leases, and amendments to leases wherein Levy's interest was set out in fractions amounting to 1/160 of all the production. The parties have argued as to the evidentiary effect of those facts if the Sweet deed were held to be ambiguous. The appellees have argued that those facts show a construction of the deed by the parties consistent with their contention that it conveyed a royalty. The appellants have countered that argument by pointing out that at the time they executed the division orders and leases Levy was their lawyer and that their execution was in reliance on his advice that the Sweet deed gave him a royalty. That argument by appellants is persuasive when related to the issue of construction of the allegedly ambiguous deed. It is not persuasively favorable to them when applied to the question as to the time at which limitations began to run on their cause of action to reform the deed. On the contrary, it is consistent with appellees'

contention that appellants should have known, and did know, many years before this suit was filed, of the facts on which they base their claim for reformation.

The trial court correctly withdrew the case from the jury and rendered judgment for the defendants because the Sweet deed unambiguously conveyed to Levy a 1/160 royalty interest in the Cade lands and because the evidence shows, as a matter of law, that the plaintiffs' alleged cause of action for reformation of the Sweet deed was barred by limitations.

The judgment of the trial court is affirmed.